**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ZACHARIAH HUDDLESTON,**

    **Petitioner,**

    **v.**

**WARDEN, MANSFIELD
CORRECTIONAL INSTITUTION,**

    **Respondent.**

                **CASE NO. 2:19-CV-03915
                JUDGE JAMES L. GRAHAM
                Magistrate Judge Kimberly A. Jolson**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, Petitioner's Reply, and the exhibits of the parties. For the reasons that follow, it is **RECOMMENDED** that this action be **DISMISSED**.

### I.      BACKGROUND

Petitioner challenges his convictions after a jury trial in the Logan County Court of Common Pleas on aggravated robbery, aggravated burglary, murder, and having weapons while under disability, with firearm specifications. The Ohio Third District Court of Appeals summarized the facts and procedural history of the case as follows:

> {¶ 2} On December 6, 2016, Huddleston was indicted by the Logan County Grand Jury on three charges, Aggravated Robbery, Aggravated Burglary and Murder. However, a superseding indictment was filed in Logan County on April 11, 2017 charging Huddleston with: Count One, Aggravated Robbery, in violation of R.C. 2911.01(A)(1), a felony of the first degree; Count Two, Aggravated Burglary, in violation of R.C. 2911.11(A)(1), a felony of the first degree; Count Three, Murder, in violation of R.C. 2903.02(B), an unclassified felony; Count Four, Having Weapons While Under Disability, in violation of 2923.13(A)(3), a felony of the fourth degree; and Count Five, Tampering with Evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree. Firearm Specifications, in violation of R.C. 2941.145, were also contained in Counts One, Two and Three. The charges

stem from the November 24, 2016 burglary, robbery and murder of Jeffrey Brentlinger ("Brentlinger") in Logan County, Ohio. Huddleston pled not guilty to all charges.

{¶ 3} On July 25, 2017 the case proceeded to a three-day jury trial. At trial the State called sixteen (16) witnesses. After the State rested its case in chief, Huddleston made a Crim.R. 29 motion to the trial court arguing that all charges against him should be dismissed due to the State's failure to prove its case. The trial court granted the motion as to count five only. Thereafter, Huddleston did not present a defense.

{¶ 4} Ultimately, the jury found Huddleston guilty of Aggravated Robbery, Aggravated Burglary, Murder, Having Weapons While Under Disability and the firearm specification. However, the trial court merged the aggravated robbery and aggravated burglary convictions (counts one and two) into the murder conviction (count three) and sentenced Huddleston to 15 years to life on the murder conviction, consecutive to a three-year sentence on the weapons charge and to a three-year sentence on the gun specification, for a total sentence of 21 years to life. (Doc. 155). It is from this judgment that Huddleston appeals, asserting the following assignments of error for our review.

ASSIGNMENT OF ERROR NO. I

Mr. Huddleston's trial counsel rendered ineffective assistance of counsel, in violation of his constitutional rights. Sixth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). (Tr. 385, 394, 401, 410–411, 416, 448, 450, 452–453, 460, 463, 464, 524; State's Ex. 13.)

ASSIGNMENT OF ERROR NO. II

The trial court erred in allowing irrelevant, prejudicial evidence, disregarding State v. Creech, and issuing an erroneous, confusing jury instruction. Fifth Amendment, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution; Evid.R. 401 and 402; State v. Creech, Slip Op. 2016–Ohio–8440. (Tr. 385, 394, 401, 410–411, 416, 448, 450, 452–453, 460, 463, 464, 524; State's Ex. 13.)

*State v. Huddleston*, 3rd Dist. No. 18-17-21, 2018 WL 1468739, at *1 (Ohio Ct. App. Mar. 26, 2018). On March 26, 2018, the appellate court affirmed the trial court's judgment. *Id*. Then, on August 1, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Huddleston*, 153 Ohio St.3d 1452 (Ohio 2018).

2

On September 6, 2019, Petitioner filed this habeas corpus petition.  He asserts, as his sole ground for relief, that he was denied the effective assistance of trial counsel.  The petition is fully briefed and ripe for resolution.

## II.     STANDARD OF REVIEW

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this case.  The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks, citations, and footnote omitted) ("AEDPA ... imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.").

AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Further, the factual findings of the state court are presumed to be correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)). The United States Court of Appeals for the Sixth Circuit has summarized these high standards:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Coley,* 706 F.3d at 748–49. Ultimately, the burden of satisfying AEDPA's standards rests with the petitioner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming the ineffective assistance of counsel to demonstrate that his counsel's

performance was deficient and that he suffered prejudice as a result. *Id*. at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir.), *cert. denied sub. nom. Hale v. Hoffner*, 134 S. Ct. 680 (2013).

A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. App'x 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011)), *cert. denied*, 135 S. Ct. 122 (2014). To make such a showing, a petitioner must overcome the "strong [ ] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 687. "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). The Court additionally has observed that while "'[s]urmounting *Strickland*'s high bar is never . . . easy.' . . . [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult." *Id*. (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). The Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id*. (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Id*.

## IV.    APPLICATION

Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to redact Petitioner's irrelevant and prejudicial statements from recordings played for the jury; failed to stipulate to the existence of a disability for the possession of a weapon; and failed to object to improper jury instructions.  More specifically, Petitioner complains that his attorney failed to stipulate to the fact of Petitioner's disability so that the jury would not learn that he had a prior criminal conviction.  (*Reply*, Doc. 10, PAGEID # 782–85).[1]  And he maintains that, while the trial court's jury instructions complied with Ohio law, the jury instructions improperly permitted his conviction based on a "failure to act."  (PAGEID # 787).

The state appellate court rejected Petitioner's claim of ineffective assistance of trial counsel on the merits:

> Huddleston claims that his trial counsel rendered ineffective assistance of counsel: for failing to seek a stipulation to his prior conviction as to the weapons disability charge; for failing to seek redaction of irrelevant, prejudicial portions of his recorded statements; and for failing to object to incorrect, confusing jury instructions.
>
> Standard of Review
>
> {¶ 6} To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him. *State v. Phillips*, 3d Dist. Allen No. 1–15–43, 2016–Ohio–3105, 2016 WL 2957049, ¶ 11, (emphasis added), citing *State v. Jackson*, 107 Ohio St.3d 53, 2005–Ohio–5981, 836 N.E.2d 1173, ¶ 133, citing, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989), quoting *Strickland* at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance

---

[1] Petitioner also argues that his attorney should have requested that the charge of having a weapon while under disability be tried to the bench.  (*Reply*, Doc. 10, PAGEID # 784).  He did not earlier raise this argument.  (*See* Doc. 8, PAGEID # 67–68).  This claim, therefore, appears to be waived.  *See Williams v. Bagley*, 380 F.3d 932, 969 (6th Cir. 2004) (allegations based on  different theories from those presented to the state courts are procedurally defaulted) (citation omitted).  In any event, as discussed, Petitioner cannot establish prejudice and his claim lacks merit.

claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Analysis

Stipulation of Prior Conviction

{¶ 7} Here, Huddleston argues that he was denied effective assistance of counsel because his trial counsel should have stipulated to his prior conviction. Specifically, Huddleston claims that because his trial counsel failed to offer a stipulation to his prior conviction that placed him under a legal disability, the jury learned of his disability during trial which thereby resulted in the ineffective assistance of counsel. We disagree.

{¶ 8} In our review of the record, we find the only reference to Huddleston's prior conviction (that placed him under a legal disability) occurred during the testimony of Det. Brugler of the Logan County Sheriff's Department. During that testimony, Det. Brugler identified a 2012 judgment entry from the Auglaize County Common Pleas Court (purportedly) convicting Huddleston of a crime that prohibited him from possessing a firearm. Det. Brugler read from the entry in open court and testified that Huddleston's date of birth and the last four digits of his (Huddleston's) social security number matched those of the defendant on the judgment entry. (Tr. 419–420). However, on cross examination, Huddleston's trial counsel attempted to raise doubt that Huddleston was the person convicted in Auglaize County because Det. Brugler was not personally present in the Auglaize County courtroom during that case. Further, during cross examination of Det. Brugler, trial counsel pointed out that a full social security number was missing from the entry.

{¶ 9} Even though Huddleston was found guilty on the Having Weapons While Under Disability charge, we find the decision not to stipulate (to the prior conviction) was a strategic trial tactic of counsel that attempted to place doubt in the jury's mind as to whether Huddleston was ever convicted in Auglaize County of a crime that placed him under a disability. As such, strategic trial decisions, even if unsuccessful, generally do not constitute ineffective assistance of counsel. *See State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶ 10} Because we give deference to strategic trial tactics of counsel, we find nothing in the record supporting Huddleston's argument that his trial counsel's performance was deficient due to the failure to stipulate to this prior conviction. Thus, this first portion of Huddleston's argument is without merit.

Statements of Defendant

{¶ 11} Huddleston next argues that he received ineffective assistance of counsel because his trial counsel failed to seek the redaction of 'irrelevant statements' made by Huddleston during an interview with Det. Brugler and made during his recorded

telephone conversations from the county jail. Relative to this argument, Huddleston directs us to fifteen (15) instances in the trial transcript wherein he asserts that trial counsel's failure to pursue the redaction of various statements amounted to ineffective assistance of counsel.

{¶ 12} We note that the majority of Huddleston's statements were made during his telephone conversations with visitors which occurred while he was incarcerated in the Logan County Jail awaiting trial. Only 5 of the complained-of statements were made to Det. Brugler during Huddleston's interview which we will discuss first.

Statements to Det. Brugler

{¶ 13} Huddleston argues that the below statements (from States Exhibit 12) made to Det. Brugler should not have been played to the jury. The statements, as they appear in the transcript, are as follows:

• "What the fuck am I'm [sic] going to rob somebody for when I can sell a little bit of weed or something?" (Tr. 385). [sic] (Actually Tr. 386).

• "Is Bellefontaine a racist town?" (Tr. 394). [sic] (Actually Tr. 395).

• "[Mr. Brentlinger] was just creepy as hell. Very creepy, man." (Tr. 401). [sic] (Actually 402).

• "I just got out in July, July 24th [2016]." (Tr. 410). [sic] (Actually Tr. 411).

• "I had a job at IPS.... I quit. I walked out. ... Yeah, I walked out. Fuck that." (Tr. 410–411). [sic] (Actually Tr. 411–412).

{¶ 14} States Exhibit 12 contains the interview video between Huddleston and Det. Brugler and Det. Joseph. That interview commences on page 377 of the trial transcript. The interview starts with Det. Brugler providing Huddleston with Miranda warnings. (Tr. 379–380). Thereafter, Det. Brugler advised Huddleston of the potential charges that he faced as a result of the death of Brentlinger. (Tr. 380–381).

{¶ 15} Next, Det. Brugler reveals to Huddleston some of the prosecution's evidence regarding the murder, verifying to Huddleston that co-defendant (Marquevous Watkins) fired the fatal shot that killed Brentlinger. (Tr. 381–382). Det. Brugler also explains to Huddleston that he has interviewed other individuals involved in the robbery of Mr. Brentlinger. (Tr. 382–383).

{¶ 16} Det. Brugler then provides Huddleston the opportunity to tell his side of the story, wherein Huddleston mitigates his involvement in Brentlinger's death (*Id.* starting at page 383). During this interplay, Huddleston spells out the plan to "hustle" Brentlinger by using two young girls (co-defendants Jasmine and Tatiana)

8

as bait to rob Brentlinger. (Tr. 383–388). Huddleston denies any involvement in Brentlinger's murder by telling the detectives "what the fuck am I'm [sic] going to rob somebody for when I can sell a little bit of weed or something". (Tr. 386). Huddleston argues that this statement, should have been redacted by counsel.

{¶ 17} The interview continues with Huddleston admitting to the detectives that he was "drunk, like two days straight", denying that a plan existed to rob Brentlinger, attempting to lessen his involvement in Brentlinger's murder. (Tr. 389). Huddleston further tells the detectives that "I didn't murder nobody". (Tr. 391). Next, Huddleston asks the detectives "is Bellefontaine a racist town", wondering whether Jasmine (his girlfriend and co-defendant) would be treated fairly in court. (Tr. 391–396). This is the second statement that Huddleston suggests should have been redacted by counsel.

{¶ 18} Thereafter, Huddleston tells the detectives "I don't rob people" and attempts to defend his co-defendants (Tatiana and Jasmine's) involvement (with Brentlinger) by referring to Brentlinger as being "creepy as hell". (Tr. 401–402). This is the third statement that Huddleston argues should have been redacted by counsel.

{¶ 19} And finally, in relation to the last two statements which Huddleston argues are prejudicial and subject to redaction, Huddleston tells the detectives "I just got out in July, July 24th. I've been on the straight and narrow since then". (Tr. 411). He also tells the detectives that he had been employed but quit that job. (Tr. 411–412).

{¶ 20} Upon our review of these passages (which Huddleston claims are prejudicial), Huddleston has not shown us how he suffered prejudice from their admission. To the contrary, the first two statements contain evidence of Huddleston's lack of intent to rob or murder Brentlinger. The third statement casts suspicion on the conduct of Brentlinger, and the last two statements show that Huddleston was recently employed. Such evidence, if believed by the jury, was material as to Huddleston's criminal intent in relation to the robbery and murder charges. More importantly, because these statements provided the jury with possible defenses as to Huddleston's intent and lack of knowledge to the conspiracy in Brentlinger's murder, we find trial counsel's decision not to redact them was a strategic trial tactic. Moreover, we find that even if these statements were redacted by the trial court, the jury could have arrived at the same verdict based upon Huddleston's confession (to Det. Brugler) and the competent and credible evidence of a conspiracy adduced at trial.

{¶ 21} Accordingly, applying the *Strickland* test (as to ineffective assistance of counsel), Huddleston has not shown us that he was prejudice by the admission of these statements into evidence.

Jailhouse Phone Calls

{¶ 22} Huddleston also argues that trial counsel was ineffective for failing to seek redaction of the following jailhouse telephone statements:

• "I can't get tried in this county. How can they try me in this county? This was a dude that worked at Honda, grew up in this town, 46 years old. All the jury is going to be old white people too that probably went to school with [Mr. Brentlinger]". (Tr. 452–453). [sic] (Actually Tr. 453–454).

• "I'm going to change the venue, man." (Tr. 453). [sic] (Actually Tr. 454).

• "And here goes everybody's statements. I highlighted shit where they lied and made up shit, you know." (Tr. 463). [sic] (Actually Tr. 464).

• "[S]he beat the murder case, obviously. Because a lawyer, they fought for it and all that shit. Well, that's what I need. [Trial counsel] don't seem like he's going to fight this shit for me." (Tr. 464). [sic] (Actually Tr. 465).

• "If I don't get what I want, I'm firing him. I need a different one to represent me. And conflict of interest, too. How do I know this man don't know this man? It's a small ass town, Bellefontaine." (Tr. 452). [sic] (Actually 453).

• "I need to get my bond lowered. I need to get up out of here." (Tr. 464). [sic] (Actually Tr. 465).

• "[I]f they got [Marquevous Watkins] convicted of it ... well, they're not going to be—they're not too worried about me." (Tr. 463). [sic] (Actually Tr. 464).

• Father: "Well, what's going to be bad is how many gun charges you got."

Mr. Huddleston: "I know". (Tr. 450). [sic] (Actually Tr. 451).

• Father: "You were institutionalized."

Mr. Huddleston: "Huh?" Father: "You were institutionalized."

Mr. Huddleston: "Hell, yeah. All that shit. I got all that shit wrong with me. And fucking, all that mental health shit, too." (Tr. 448). [sic] (Actually Tr. 449).

• Father: "So, your—lawyers already seen the video."

Mr. Huddleston: "Yeah."

Father: "What did he say?"

Mr. Huddleston: "He told my grandmother the dude's charges ain't going to change." (Tr. 460). [sic] (Actually Tr. 461).

{¶ 23} In our review of these statements, we again determine that Huddleston's trial counsel's strategy was to permit the jury to hear all of Huddleston's conversations. Such tactic resulted in the jury receiving all of Huddleston's impressions as to: how he was being represented; how unsympathetic of a victim Brentlinger may have been; how difficult it would be for him to get a fair trial; and how he had mental health issues. All of these statements occurred without him (Huddleston) having to testify and be subjected to cross-examination. As such, all of Huddleston's comments and complaints were received by the jury without cross-examination.

{¶ 24} Moreover, and similar to our finding as to Huddleston's statements made to Det. Brugler, Huddleston has failed to show us how he was prejudiced by the admission of these statements.

{¶ 25} Accordingly, the second portion of Huddleston's argument under this assignment of error is without merit.

Jury Instruction on Causation

{¶ 26} Finally, Huddleston argues that he received ineffective assistance of counsel when his trial counsel failed to object to the jury instruction on "causation". Huddleston argues that the trial court used 'generic' language regarding the causation element of the murder charge instead of tailoring its instruction to the facts of the case. Huddleston claims he was prejudiced because the jury could have found him responsible for Mr. Brentlinger's murder by virtue of his "failure to act", which, he contends, is simply inaccurate.

{¶ 27} The jury instructions at issue herein are as follows:

"The State charges that the act or failure to act of the defendant caused Jeffrey Brentlinger's death.

Cause is an essential element of the offense. Cause is an act or failure to act, which in the natural—which in a natural and continuous sequence directly produces the death, and without which it would not have occurred.

The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of the events from the act or failure to act.

* * *

11

The State of Ohio has presented a theory that the defendant acted in complicity with the principle offender in the commission of the murder of Jeffrey Brentlinger. A person who is complicit with another in the commission of a criminal offense is regarded as guilty as if he personally performed every act constituting the offense. This is true even if he did not personally perform every act constituting the offense and was not physically present at the time the offense was committed.

Before you can find the defendant guilty of complicity in the commission of the murder offense, you must find, beyond a reasonable doubt, * * * the defendant, while committing the aggravated burglary or aggravated—while committing the aggravated robbery or the aggravated burglary, aided or abetted another in committing the aggravated robbery or aggravated burglary, which caused the death of Jeffrey Brentlinger.

* * *

Before you can find the defendant guilty of complicity to aide and abet, you must find, beyond a reasonable doubt, that the defendant supported, assisted, encourage, cooperated with, advised, or incited the principle offender in the commission of the offense and the defendant shared the criminal intent of the principle offender. Such intent may be inferred from the circumstances surrounding the offense, including, but not limited to * * * conduct before and after the offense was committed."

(Emphasis added). (Tr. 525–528).

{¶ 28} Huddleston's trial counsel did not object to this instruction.

{¶ 29} In our review, we find the trial court's instruction on causation was taken nearly verbatim from the Ohio Jury Instructions. (*Id.*) Moreover, generally the rule regarding appellate review of jury instructions is that a sole instruction must be viewed within context of the whole set rather than in isolation. *State v. Coe*, 3d Dist. No. 13–97–46, citing *State v. Taylor*, 78 Ohio St.3d 15, 29–30 (1997); *State v. Price,* 60 Ohio St.2d 136, paragraph four of the syllabus. The Supreme Court of Ohio has held that "the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel". *State v. Cepec*, 149 Ohio St.3d 438, 2016–Ohio–8076, ¶ 117.

{¶ 30} As to the evidence adduced at trial, Huddleston admitted (to Det. Brugler) that he stopped at Walmart before leaving Lima to purchase ski masks and duct tape; to entering Brentlinger's home with his gun in hand; and to pointing his gun in the general direction of Brentlinger. (Tr. 390, 393–394). Huddleston also admitted to being aware that his co-defendant also had a gun. While Huddleston argues that he could not be convicted of murder for his failure to act, we find his statements alone could lead a jury to a finding of guilty of complicity. Thus, even assuming that the trial court's instruction on causation (i.e. "failure to act") was problematic, such instruction is harmless beyond a reasonable doubt, due to

competent and credible evidence presented by the State that Huddleston was a part of the conspiracy which resulted in Brentlinger's murder.

{¶ 31} Moreover, Huddleston has failed to convince us how the jury instruction on causation resulted in confusion to the jury or resulted in actual prejudice under the totality of the evidence presented against him at trial. Thus, we find his argument is without merit.

{¶ 32} Accordingly, Huddleston's first assignment of error is not well taken and overruled.

Petitioner has failed to establish the denial of the effective assistance of counsel under the two-prong *Strickland* test.

*State v. Huddleston*, 2018 WL 1468739, at *1–6.

Upon review of the record, the Undersigned cannot conclude that the state appellate court unreasonably concluded that defense counsel exercised a reasonable trial strategy in permitting the admission of his entire videotaped statement to police. Further, the trial court's jury instructions complied with Ohio law, so counsel therefore did not unreasonably fail to object to those instructions. Given this, Petitioner has not shown that the state courts unreasonably applied the first prong of the *Strickland* test. The failure is fatal to his claim.

In addition, Petitioner has not shown that the state appellate court's prejudice analysis was unreasonable. Indeed, Petitioner does not allege—and the record does not reflect—that the prosecution would have been unable to establish the charge of having a weapon while under disability or that evidence of Petitioner's prior conviction prejudiced him in view of the overwhelming evidence of Petitioner's guilt. Petitioner accurately summarized some of the facts against him as follows:

On the morning of Thanksgiving Day 2016, Jeffrey Brentlinger's 24-year-old daughter found his lifeless body lying on the floor of their Zanesfield home, and called 911. Tr. 140-142. Although Mr. Brentlinger's daughter lived in the home, she had spent the previous night with her boyfriend, arriving back home at about 10:45 a.m. Tr. 140. The deputy who responded to the 911 call noted that Mr. Brentlinger had been deceased long enough that he was cold to the touch. Tr. 162.

13

Logan County Sheriff's Detective Phil Bailey arrived at about 11:30 a.m.  He noted a shell casing lying next to Mr. Brentlinger's body, and also observed a gunshot wound to Mr. Brentlinger's chest.  Tr.  177-178.  With the assistance of BCI, Detective Bailey collected evidence from the scene that afternoon, including the first shell casing he saw, another casing found in the living room, a bullet found on the bathroom floor, and a black ski mask found outside of the house, near the road.  Tr. 185-191.  Later, when the house was being cleaned, a third casing was found in a floor vent that was located near where Mr. Brentlinger's body was found.  Tr. 191, 227-228.  No other bullets were found at the scene, but one was recovered from Mr. Brentlinger's body.  Tr. 191-192.  The casings found in the living room and in the floor vent were made of steel, and were manufactured by TulAmmo.  Tr. 210-211.  The casing next to Mr. Brentlinger's body was made of brass, and was manufactured by Smith and Wesson.  Id.  No usable fingerprints were obtained from the home.  Tr. 182.

On the next day, Detective Bailey returned to the home with Mr. Brentlinger's daughter and recovered a table-type personal computer that belonged to Mr. Brentlinger.  Tr. 182, 193.  When that computer was examined by BCI, it was found to contain a video created during the early-morning hours of Thanksgiving Day.  Tr. 220-223.  That video recording showed Mr. Brentlinger talking in his bedroom with two teen-aged girls, who would later be identified as Tatiana Freeman and Jasmine Lewis.  The evidence at trial established that Mr. Brentlinger had requested that they come to his home to have sex.  Mr. Brentlinger had recently begun exchanging messages with Ms. Lewis, who was using a cell phone registered in Mr. Huddleston's name, and Mr. Brentlinger had met with her in person in Lima two days previously.  Tr. 339-340, 383-384.

After the girls had been inside Mr. Brentlinger's house for about 30 minutes, two men, later identified as Marquevous Watkins and Zachariah Huddleston, entered the house, seeking to subdue Mr. Brentlinger and take valuables from his house.  When Mr. Brentlinger resisted, Mr. Watkins shot him in the chest.  Mr. Huddleston also fired a handgun, with one shot missing Mr. Brentlinger altogether, and another shot seemingly grazing him.  Tr. 254-56.  This encounter was not fully captured by the computer's camera, but its microphone did result in the ongoing recording capturing audio of an exchange of words between Mr. Watkins and Mr. Brentlinger, and also the sound of the gunshots.  After the shooting occurred, Watkins, Huddleston, Lewis, and Freeman immediately fled, panicked by the unexpected, tragic turn of events.  The only property taken from Mr. Brentlinger's person or his house was his cell phone.

The ski mask recovered outside the house bore DNA consistent with that of Marquevous Watkins, and which would be expected to be found in one in every three trillion unrelated individuals.  Tr. 432-433.  After Mr. Huddleston was arrested, his belongings were found to include a handgun and a box containing TulAmmo cartridges.  Tr. 277-278.  Ballistics testing on the gun showed that it was

consistent with the gun that left the two TulAmmo casings at the scene, but it was not the gun that fired the bullet that killed Mr. Brentlinger.  Tr. 321, 324-325.  Mr. Huddleston admitted, in a recorded interview with detectives, to being involved in the robbery attempt with Mr. Watkins, the two girls, and a third female codefendant who remained outside in the car, and also admitted to firing the gun he had with him when he entered Mr. Brentlinger's house.  Tr 391, 400.  Further, he made similar admissions on two jailhouse recordings made when he was talking to family members.  Tr. 457-458, 463.

(*Merit Brief of Zachariah Huddleston*, Doc. 8, PAGEID # 63–65).

Additionally, as discussed by the state appellate court, Petitioner admitted in a videotaped statement to police, that was played for the jury, his involvement in the plan to rob Brentlinger that resulted in Watkins' shooting and killing Brentlinger and the accidental shooting of Petitioner's firearm.  (*Transcript, Vol. II*, Doc. 8-1, PAGEID # 559–99).  He also made incriminating statements during taped telephone conversations from the jail that were played for the jury.  (*Transcript, Vol. II,* Doc. 8-1, PAGEID # 629–43; 644–48).  Under these circumstances, and in view of the overwhelming evidence of guilt, the state appellate court was not wrong in concluding that Petitioner could not establish prejudice.

In sum, Petitioner has failed to establish that the state appellate court unreasonably applied or contravened *Strickland* or otherwise based its decision on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Petitioner's claim of ineffective assistance of counsel therefore does not provide him a basis for relief.

## V.       DISPOSITION

For the foregoing reasons, it is **RECOMMENDED** that this action be **DISMISSED.**

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.

Date: April 29, 2020

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE